ANDERSON, Justice,
for the Court:
In the case at bar the chancellor in the Chancery Court of Jefferson County, Mississippi, awarded to Jimmie L. Goodson, defendant below and appellee here, a permanent easement across the property of F.M. Jordan, plaintiff below and appellant here. Finding merit in the issues Jordan raised on appeal, we reverse and render the cause.
FACTS
On February 5, 1983, Jordan, an absentee landowner residing in Louisiana, filed a petition for issuance of a mandatory injunction seeking to enjoin Goodson from trespassing upon his land and damaging gates and locks placed thereon by him. Goodson answered the petition and filed a cross complaint asking the court to award him a permanent easement across Jordan’s property. Goodson’s amended cross complaint alleged that his use of said roadway, located at the northern boundary line of Jordan’s property, had been hostile, continuous and obstinate for more than ten years, entitling him to a permanent easement by adverse possession.
Jordan’s and Goodson’s lots, lots 5 and 4 respectively, were located adjacent to each other. Jordan’s lot was adjacent to the public roadway at the eastern boundary line, and Goodson’s lot located southwest of Jordan’s.[1] (See Attachment.)
With the exception of the south boundary line, Jordan enclosed his lot with a solid fence when he purchased it. The only access to Jordan’s lot from the public road was a “gap” located off of it in the middle of the lot. The “gap” led to a cotton house located about seventy-five or one-hundred feet into Jordan’s lot. Testimony revealed that this path had been in existence since the 1930’s; however, it was used basically for cattle or travelling by foot.
The testimony was disputed as to the exact year the roadway at the northern boundary line of Jordan’s property was constructed; but all the witnesses testified that it was constructed sometime in the 1970’s. Jordan first discovered the roadway in 1976. At that time Jordan told Goodson that he would not permit use of the roadway on his property. However, Jordan subsequently rented his lot to Good-son’s father, Leon, from 1977 to 1981. After the five-year lease’s expiration, by agreement, Leon held over on the lot.
After Leon vacated the property, on August 25, 1982, Jordan installed a lock and chain on the gates at the roadway in dispute. The following day on August- 26th, Jordan discovered that the lock and chain were cut-off. Goodson subsequently admitted to Jordan he cut the chain and lock and would do so each time Jordan installed them. The chain and lock were cut-off on approximately three separate occasions. *850 Additionally, posted signs were removed from the property.
Goodson first used his lot in 1960 for pasturing and grazing under a lease agreement until he purchased it on December 20, 1972. Prior to building the roadway in dispute, Goodson crossed Jordan’s property at the “gap” down the hill each time he went to his lot. Goodson testified that the Gilberts, the predecessors in interest to both Lots, also crossed Lot 5 as a means of ingress and egress to Lot 4.
Goodson relocated the path to the northern boundary line of Jordan’s property in 1970, and continued to use it after Jordan told him to stop because it was the only means of access for a vehicle. Goodson admitted that he removed the locks from the gate that Jordan installed, but denied removing the chains. Goodson had not used the path below the hill as a means of access to his Lot since 1970, and therefore, had abandoned it and made no claim to it.
The court found from clear and convincing evidence that Goodson had acquired a permanent prescriptive easeriient under a claim of right for use of the roadway across the northern boundary of Jordan’s property, and the right was acquired about the year 1970, although Goodson and his predecessors in title had used another roadway prior to that time. The court awarded, therefore, to Goodson a permanent easement across Jordan’s property and adjudicated that the roadway had been used continuously, openly and without interruption under a claim of title for the statutory period of more than ten years. The court specifically found that Goodson and his predecessors in title acquired a prescriptive easement well prior to the changing of the location of the present roadway which had been used since about 1930. Thus, the chancellor denied Jordan’s petition for issuance of mandatory injunction.
I.
The sole issue we address is whether the lower court erred in its determination that Goodson established a prescriptive easement during the time span that Goodson’s father leased the subject property from Jordan. The chancellor found that the prescriptive easement below the hill (the “gap”) had been properly moved to the northern boundary line of Jordan’s property. First, the path below the hill was just that — a path for cattle or for a person to travel by foot. However, Goodson did not relocate this path to Jordan’s northern boundary line. Rather, he created a gravel road.
“Once an easement has been acquired by prescription, its general location can be changed either by oral consent or by acquiescence.” Flanagan v. Branton, 224 Miss. 214, 220, 79 So.2d 823, 824 (1955). However, “the owner of a prescriptive easement, ..., cannot extend it beyond the actual user nor beyond such width as is reasonably necessary for the purpose for which it was created or acquired.” Lindsey v. Shaw, 210 Miss. 333, 49 So.2d 580, 584 (1950) (citing 17 Am.Jur., Easements, Sec. 105).
Here, Goodson changed the character and use of a mere path when he relocated it to Jordan’s northern boundary line. Jordan neither consented nor acquiesced to such a change; therefore, it was not permissible and the chancellor erred in finding that the roadway was properly relocated. Consequently, the easement’s prescriptive period at the northern boundary line on Jordan’s property could not begin to run until the construction of the roadway in 1970.
II.
Goodson’s father, Leon, leased the property in question in 1974 and from 1977 through 1981. The record is unclear, but at least for one (1) year Leon leased the same property from Jordan’s brother-in-law. Jordan contended, therefore, that Leon could not permit a claim of prescription to run in favor of Goodson during the period of the lease.
Goodson contended that Jordan’s argument that his father’s lease precluded an easement by prescription, was misplaced in that Goodson’s father claimed neither a right of use through prescription nor adverse possession. Secondly, Goodson con *851 tended that Jordan’s erection of gates across the roadway in question was neither inconsistent with the right to use the roadway, nor an interruption as is required to stop the running of the statute of limitations.
“It is well settled that a tenant cannot assert title adverse to his landlord.” Price v. Moss, 214 Miss. 253, 261, 58 So.2d 661, 663 (1952). Additionally, 51C C.J.S. Landlord and Tenant § 286, at 736 states:
Not only is the tenant precluded from relying on his possession to bar his landlord, but also all persons who come in under, or derive possession from, him in any manner, however remotely, stand in no better position, even though they have no knowledge of the tenancy relationship. Possession is presumed to be in accordance with title until a positive repudiation of the tenancy is brought to the knowledge of the landlord against whom title by adverse possession is claimed. Thus one to who the tenant attorns will not be regarded as holding adversely to the landlord, although he may establish an adverse possession where the landlord has notice of such attornment.
See, also, Jackson v. Genecov, 471 S.W.2d 589 (Tex.Civ.App.1971) (claimant’s possession which was joint with the tenant of the owner is not of the exclusive nature necessary to adverse possession); Petty v. Dunn, 419 S.W.2d 417 (Tex.Civ.App.1967) (“[a]ny sort of joint or common possession by a claimant and the owner, or a tenant of the owner prevents the claimant from having the requisite quality of exclusiveness”).
CONCLUSION
For the sake of argument we assume, as the chancellor, that the roadway located on Jordan’s northern boundary line was constructed in 1970. Goodson’s father leased Jordan’s property for approximately seven years out of the required ten-year statutory period.
The evidence showed that until 1976, Jordan had no knowledge that his property was used as a means of ingress and egress to Goodson’s property. Even with such knowledge, once Jordan leased his property to Goodson’s father, with the exception of waste, he relinquished control of it during the leasehold. Here, such release was for approximately seven years. Therefore, we must reverse and render the cause for two reasons. First, the roadway at Jordan’s northern boundary line was not of the same character or for the same use as the path below the hill; and secondly, Goodson could not claim a right of adverse possession during the period his father leased the alleged servient property from Jordan.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, PITTMAN and BLASS, JJ., concur.
PRATHER and SULLIVAN, JJ., dissent.
*852 [[Image here]]

. Both lots were used for agricultural purposes. It appears from the record that an easement by implication or necessity could not be created. Testimony revealed that other accesses to Good-son’s lot existed; but the roadway in dispute was the only means that would accommodate a vehicle.